UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THAI TOURS AND TRANS AIRWAYS COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> BCI AIRCRAFT LEASING, INC. and CRAIG PAPAYANIS, <br><br> Defendants. | No. 13 C 8511 <br><br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thai Tours and Trans Airways ("TTT") filed this action against Defendants BCI Aircraft Leasing, Inc. ("BCI") and Craig Papayanis ("Papayanis"), alleging breach of contract and a variety of related claims. This matter is presently before the court on Defendants' motion to dismiss Counts I (breach of contract), II (breach of implied covenant of good faith and fair dealing), IV (promissory estoppel), V (tort), and VI (negligent misrepresentation) of the First Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, I grant Defendants' motion in entirety.

## BACKGROUND

BCI is a commercial aircraft leasing company that, among other things, leases older Boeing 737-300s and 737-400s, known as "Classics," in emerging markets, such as Latin America, Africa, and Asia. Craig Papayanis is the Managing Director and Chief Financial Officer of BCI. TTT is a start-up airline in Thailand that planned on providing travel and entertainment packages to various Asian locations, such as China, India, Hong Kong, and Singapore. These plans never came to fruition.

1

TTT and BCI began discussing an aircraft lease arrangement in April 2013, roughly four months after the Thai government granted TTT an Airlines Operating License that required TTT to begin flight operations within one year. Around this same time, TTT was also discussing a possible lease with another aircraft leasing company, AerSale Aviation Limited ("AerSale").

A central component to this case is a metric for measuring plane navigation systems, required navigation performance ("RNP"). A plane with an RNP of 1 (referred to as "RNP1") means that the plane is equipped with a navigation system that is capable of calculating its position to within a circle with a radius of 1 nautical mile. A plane with an RNP of .5 (or "RNP.5") means that the plane's navigation system can calculate its position to within a smaller circle, one with a radius of 0.5 nautical miles. This metric is important in the present case because, according to TTT, a plane's RNP is one factor that an airport can use to determine whether that plane can access the airport. For example, although TTT alleges that most of the airports that TTT planned on flying into require RNP5 capability, TTT claims that Hong Kong International Airport—which TTT was contemplating using—requires RNP1 capability.

After AerSale offered to lease two RNP5 capable planes for a monthly price of $40k each, AerSale and TTT signed a letter of intent. Allegedly aware of TTT's discussions with AerSale, BCI offered TTT its own bid in June 2013—two RNP1 capable planes for a monthly price of $50k per aircraft. TTT alleges that it explained that RNP1 capability was necessary to fly into Hong Kong International Airport and that immediate delivery was required in order to fulfill its planned business ventures. According to TTT, BCI said that they could provide greater economic promise and familiarity with Thai aviation authorities than AerSale because BCI was familiar with the Thai aviation authorities.

After these discussions, TTT canceled its letter of intent with AerSale and signed a

seven-page agreement—a document that refers to itself as a "proposal letter," but is referred to by the parties as a letter of intent (the "LOI")—with BCI on June 22, 2013. The LOI summarizes the terms and conditions of the arrangement, namely that BCI would provide TTT with two freshly painted Boeing 737-300 planes, identified by their serial numbers, for a monthly price of $50k per aircraft for 36 months. In addition to providing that each "aircraft shall be RNP1 capable," the LOI also includes a choice of law provision that designates New York state law and a section entitled, "Conditions Precedent," which states:

> The obligations of Lessor and Lessee to perform their respective obligations under the transactions contemplated will be subject to the following Conditions Precedent:
>
> (A) Preparation, negotiation and execution of the Lease and other documentation, including registration, indemnification, insurance, and other customary terms within thirty (30) days of the date of this Proposal letter, or as otherwise agreed by the parties.
>
> (B) Lessor's receipt of the Security Deposit
>
> (C) Lessor's approval of Lessee's financial condition, including Lessor's receipt and review of the financial statements and business plan of Lessee
>
> (D) Each of Lessee's and Lessor's Board or management approval for the terms and conditions contained herein
>
> (E) Lessee's satisfactory acceptance of the clearance of CPCP and/or AD and/or SB tasks for the next 18 months from the delivery date
>
> (F) Delivery of the Aircraft in the condition required as set forth herein

The LOI also required TTT to pay a $150k security deposit for each aircraft, with $50k due upon execution of the LOI, $50k due upon execution of the "definitive lease agreement" (also referred to as the "Lease"), and $50k due upon delivery of each aircraft.

3

Both parties signed the LOI at the bottom of the last page where it said "please evidence your acceptance of the provisions of this Proposal Letter by signing it in the space provided below" and penned floating signatures on the bottom of the first six pages. After signing the LOI, TTT gave BCI a $50k security deposit for each aircraft. On August 3, 2013, the LOI was amended to provide new delivery dates for the two planes, September 15, 2013 and November 15, 2013. Subsequently, TTT entered into another LOI with a major travel company to render daily flight service between Bangkok and Hong Kong.

As set forth under the LOI, TTT inspected the planes on June 27, 2013 and September 9, 2013. According to TTT, however, their experts were not given the opportunity to adequately inspect the interior of the first aircraft during the June inspection. Just before the September inspection, BCI informed TTT that the two planes were actually RNP.5 capable instead of RNP1 capable. Oddly, this discrepancy—offering RNP.5 capable planes after agreeing to RNP1 capability—fuels the entire dispute.

On September 24, 2013, BCI provided TTT with a final draft of the lease that took out the reference to the aircraft being RNP1 capable. When TTT objected that they had agreed to RNP1 capability instead of RNP.5 capability, BCI said that it would cost TTT between $500-$850k to outfit each aircraft with RNP1 equipment, which is not as good as RNP.5 equipment anyway. Consequently, TTT informed BCI that it was unwilling to accept anything other than the promised RNP1 capable planes. Two weeks later, BCI informed TTT that it could not deliver RNP1 capable planes and returned TTT's security deposit. Without planes, TTT failed to meet its operating deadline and lost its license from the Thai government.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) does not test the merits of a claim; rather it tests the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, the court accepts all well-pleaded facts as true, and draws all reasonable inferences in favor of the plaintiff. *Id.* at 1521. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

### I. Count I (Breach of Contract Claim)

TTT's breach of contract claim is the crux of the Complaint. To establish a breach of contract claim under New York law—which both parties agree governs here because of the LOI's choice of law provision—a plaintiff must plausibly allege "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The Second Circuit has explained that, under New York law, "where the parties contemplate further negotiations and the execution of a formal instrument," a preliminary agreement ordinarily "does not create a binding contract." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). "In some circumstances, however, preliminary agreements can create binding obligations." *Id.*

In determining the extent that a preliminary agreement binds the parties, courts must

5

consider two competing interests. Courts must be wary of "trapping parties in contractual obligations that they never intended" to undertake. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). At the same time, courts must "enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation." *Id.* In order to determine the extent of a preliminary agreement's binding effect, federal courts look to the template provided by the Second Circuit in *Teachers Ins. & Annuity Assoc. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) ("*Tribune*"). In *Tribune*, the court determined that the enforceability of a preliminary agreement depends upon two factors: (1) whether the parties intended to be bound and (2) whether there had been an agreement on the essential terms of the transaction. *Id.* at 497. As the court pointed out in *Tribune*, a finding that a preliminary agreement creates binding obligations does not necessarily resolve a dispute because this finding raises questions of the nature, scope, and extent of the binding obligations. *Id.*

Preliminary agreements that have binding force can be one of at least two distinct types. *Id.* at 498. Type I contracts are preliminary agreements where the parties have reached complete agreement—including the agreement to be bound—on all essential terms and intend to finalize the agreement in a formalized agreement. *Id.* "Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* "The second stage is not necessary; it is merely considered desirable." *Id.* As the Second Circuit has noted, "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *Id.* (quoting *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968)).

In contrast, Type II contracts are preliminary agreements where the parties express mutual commitment to a contract on the agreed main terms, while recognizing the existence of

6

open terms that require further negotiating. *Tribune*, 670 F. Supp. at 498. Unlike Type I contracts, where parties are bound to their ultimate contract terms, parties of Type II contracts are only bound to a mutual commitment to negotiate the open issues in good faith. *Id.* "If the parties fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation."*Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008).

Although the Type I/II framework set forth in *Tribune* essentially remains the same today, courts have added additional factors in determining whether a preliminary agreement falls into either category. To determine whether the LOI is either a Type I or Type II contract, we must now consider: "(1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Gas Natural, Inc. v. Iberdrola, S.A.*, 2014 WL 3545466, at *4 (S.D.N.Y. July 17, 2014) (citing *Cara*, 420 F.3d at 157). "The first factor, the language of agreement, is the most important." *Id.* (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989)).

TTT argues that a 12(b)(6) dismissal is inappropriate because determining intent is a question of fact, not law. The New York Court of Appeals, however, has held that this decision is a question of law when it "is determinable by written agreements," and is a question of fact "[o]nly where the intent must be determined by disputed evidence or inferences outside the written words of the instrument." *Mallad Const. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291 (1973); *see also W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."). "[I]n a matter where parties seek enforcement of a contract, the court has the

7

responsibility of effectuating the true intent of the parties, and where the terms are unambiguous, this intent must be gleaned from the plain meaning of the words used by the parties. *Fukilman v. 31st Ave. Realty Corp.*, 39 A.D.3d 812, 813 (2007).

Here, intent can be determined as a matter of law because the language of the LOI is unambiguous, and this language indicates an objective intent not to be bound by the LOI's terms. There are several aspects of the LOI that, in the cumulative, make this conclusion the only possibility. First, the LOI repeatedly references itself as a "proposal," "Proposal Letter," and "Proposed Letter of Intent," and distinguishes itself from the "definitive lease agreement" or "Lease" that will follow. Second, the pay structure of TTT's security deposit—requiring an additional $50k upon the execution of the Lease—shows that the execution of the Lease is not a mere formality. Third, and most importantly, the "Conditions Precedent" section of the LOI explicitly states that neither party has any obligations to the underlying transaction without a series of conditions that evidence the parties' intent not to be bound to the underlying transaction based on LOI alone. These conditions include: the preparation, negotiation, and execution of a formal lease agreement, BCI's approval of TTT's financial condition, TTT's approval of the planes, and both companies' board or management approval. All of these reasons cumulatively establish the lack of intent by the parties to be bound until the execution of a definitive lease.

The other factors we must consider cut both ways, but not with enough force to offset the implications of the first factor. Although the LOI describes most of the material terms of the lease—price, quantity, RNP capability, and duration—material terms alone are not sufficient to form a Type I contract. Further, there was no partial performance on the actual plane lease—neither the planes nor their respective monthly premiums ever changed hands. On the other hand, plane leases customarily call for lengthy and formal contracts that are typically hammered out

8

with a team of lawyers. Any of the remaining factors are factual in nature, but there is nothing in the Complaint that alleges facts anywhere near sufficient to overpower the force of the language within the LOI, which shows that the parties did not intend to be bound to the underlying transaction—the plane lease—primarily because they *both* retained the right to walk away.

This case would be different if the only condition precedent was the execution of a more formal agreement. *See Bed Bath & Beyond Inc. v. Ibex Const., LLC*, 52 A.D.3d 413, 414 (1st Dep't 2008) (finding that a writing denominated as a "Letter of Intent" that calls for the execution of a formal contract does not render it an unenforceable agreement to agree). It would also be different if board approval of only one of the parties was required as a condition precedent. *See Tribune*, 670 F. Supp. at 499 (determining that a Type I contract existed where board approval of defendant, but not plaintiff, was listed as condition precedent). However, where a preliminary agreement (1) anticipates a more formal and definitive contract, (2) explicitly gives both parties the right to walk away from executing it for any reason, and (3) repeatedly calls itself a "proposal," the parties must have intended to remain unbound until the subsequent, more formal, contract was executed. By pleading in the Complaint that the parties never executed the Lease, TTT admits that at least one of the conditions precedent explicitly required by the LOI has not been satisfied. Because neither party is bound to the underlying transaction, TTT's claim for breach of contract fails as a matter of law.

**II.        Count II (Breach of Implied Covenant of Good Faith and Fair Dealing Claim)**

Under New York law, the covenant of good faith and fair dealing is implied in every contract. *See Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 298–300 (S.D.N.Y. 2012). As discussed above, however, the parties never executed the formal lease that was contemplated in the LOI. Because a party cannot breach a contract before entering into it, neither party is

9

bound to the plane lease or any of its implied covenants, such as the covenant of good faith and fair dealing. *See id.* at 300. Rather, in a Type II contract such as the LOI, parties are only bound to a mutual commitment to negotiate the open issues in good faith. *Tribune*, 670 F. Supp. at 498. Any claim under the LOI for breach of good faith must relate to this commitment.

The Second Circuit has explained the purpose of an agreement to negotiate in good faith as follows: "In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) ("*L–7 Designs I*"). A party "may abandon the transaction" as long as it has "made a good faith effort to close the deal" and has "not insisted on conditions that do not conform to the preliminary writing." *Id.* "In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated." *L–7 Designs, Inc. v. Old Navy, LLC,* 964 F.Supp.2d 299, 307 (S.D.N.Y. 2013) ("*L–7 Designs II*").

Good faith is admittedly difficult to describe, but *L-7 Designs II* draws several generalizations. *Id.* First, "good faith requires honesty in fact." *Id.* Second, "self-interest is not bad faith." *Id.* Third, "bad faith requires some 'deliberate misconduct'—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment." *Id.* at 307. Lastly, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).

Although the question of whether a party acted in good faith is typically not suitable

for a resolution on a motion to dismiss, courts have, on occasion, decided the issue at the pleading stage. *See, e.g., Gas Natural*, 2014 WL 3545466, at *9 (dismissing claim for failure to negotiate in good faith on a 12(b)(6) motion); *Miller Auto. Corp. v. Jaguar Land Rover N. Am., LLC*, 471 Fed.Appx. 37, 39 (2d Cir. 2012) (affirming district court's 12(b)(6) dismissal of claim for failure to negotiate in good faith). These 12(b)(6) dismissals rest on the Supreme Court's decision in *Iqbal*, which requires at least some assessment of whether the Complaint has alleged facts that "nudge" an assertion that a party has acted in bad faith "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

The question to consider on the present motion, therefore, is whether TTT properly plead that BCI acted in bad faith, and I conclude that TTT's pleadings are insufficient in their current form. In the Complaint, TTT alleges that BCI acted in bad faith by offering two RNP.5 capable aircraft instead of the agreed-upon RNP1 capable aircraft. This reason, which allegedly brought the negotiations to a halt, is completely absurd. Considering nothing but the equation for a circle's area, an RNP.5 system is four times more precise than an RNP1 system—how is offering a more precise system a drawback? TTT has failed to allege how, if at all, the more precise RNP.5 system frustrates its requirement for RNP1 capable aircraft. Furthermore, without looking at anything more than the pleadings in the Complaint, TTT alleges that planes with more precise RNP systems can fly into airports that require a certain RNP capability.[1] "RNP1 capability," therefore, must be satisfied by planes with RNP1 systems *or better*, just as a requirement that a plane can reach a certain altitude is certainly fulfilled by a plane that can exceed that altitude.

---

[1] In the Amended Complaint, TTT alleges that RNP5 capable planes could serve all of its required flight operations except the daily flight to Hong Kong International Airport, which requires RNP1 capability. TTT further alleges that planes equipped with RNP1 systems could serve their entire flight operations, which means that planes equipped with RNP1 systems can fly into airports that require RNP5 capability.

11

If TTT's pleadings were the other way around—that is, if BCI showed up with an RNP1 system after agreeing to RNP.5 capability—and then asked for additional money to upgrade, TTT would have a claim on which relief could be granted. According to TTT's pleadings in the Complaint, however, TTT has failed to plausibly allege that BCI violated its duty to negotiate in good faith. I am dismissing this claim without prejudice because this pleading deficiency may be curable if TTT can allege facts showing that an RNP.5 aircraft is not considered to be "RNP1 capable."

### III.    Count IV (Promissory Estoppel Claim)

A claim for promissory estoppel requires a plaintiff to show "1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Gas Natural*, 2014 WL 3545466, at *3 (citing *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000)). "Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement—for example, the Statute of Frauds or a failure of consideration." *Id.* at *11 (citing *BNP Paribas Mortgage Corp. v. Bank of Am., N.A.,* 949 F.Supp.2d 486, 516 (S.D.N.Y. 2013)).

TTT's promissory estoppel claim fails for two reasons. First, there is no "contract formation problem" in this case that would "otherwise prevent enforcement." I have already concluded that the parties actually entered into a binding contract—a contract to negotiate in good faith. TTT's promissory estoppel claim is therefore completely identical to its breach of contract claim, and must be dismissed. *See, e.g., Gas Natural*, 2014 WL 3545466, at *11; *Simpri v. City of New York*, 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003) (dismissing promissory estoppel claim that was identical to breach of contract claim). Second, TTT failed to properly

plead that BCI acted in bad faith, and so there is no injury. Although the latter reason may be curable by amending the complaint, the former is not.

**IV.     Count V (Prima Facie Tort)**

In its response, TTT consents to this claim's dismissal.

**V.      Count VI (Negligent Misrepresentation)**

Under New York law, negligent representation requires that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

BCI and Papayanis argue that TTT's negligent misrepresentation claim must be dismissed because there is no special relationship, and therefore no duty. While "[t]he existence and scope of a duty of care is a question of law" *Murphy v. La Framboise Grp., Ltd.*, 839 N.Y.S.2d 883, 885 (2007), both the Second Circuit and the New York Court of Appeals have stated that whether a special relationship exists between two parties is a question of fact to be governed by weighing three factors: (1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001); *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).

A "special relationship requires a closer degree of trust than that in an ordinary business relationship." *Wright v. Selle*, 27 A.D.3d 1065, 1067 (2006). The Second Circuit has determined that "to the extent that a 'special relationship' is sparsely pled," a complaint may overcome a motion to dismiss under Rule 12(b)(6) by emphatically alleging the other two factors. *Suez*, 250 F.3d at 103. TTT attempts to do this in the Complaint by alleging that BCI and Papayanis made extravagant promises about their commercial airline knowledge and their sway over aviation authorities in Southeast Asia.

Albeit a close call, TTT's negligent misrepresentation claim cannot be dismissed in this case because TTT has successfully alleged the existence of a special relationship. An important case to consider here is *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, where the court analyzed whether a special relationship occurred between two parties negotiating a commercial airline lease. 247 F. Supp. 2d 352, 366 (S.D.N.Y. 2002). Acknowledging that "the relationship between unaffiliated business entities negotiating a commercial lease would seem an unlikely candidate for being considered such a special relationship," the court nonetheless "assume[d] for present purposes that these somewhat sparse allegations suffice[d]" before dismissing the claim for lack of reasonable reliance. *Id.* Although the court in *Taca Int'l Airlines* only "assumed" that TTT's pleadings were sufficient, it provided reasoning in support of its assumption that is both convincing and directly applicable to this case.

Although all the parties in this case were sophisticated participants in the commercial airline industry, TTT's allegations stress how much BCI and Papayanis held themselves out to hold unique and special expertise about airline operations in Southeast Asia and the particulars of their planes. Furthermore, TTT has repeatedly alleged that BCI and Papayanis were aware of how their information would be used. Accordingly, TTT's negligent misrepresentation claim

14

cannot be dismissed for lack of a special relationship.

TTT's negligent misrepresentation claim, however, can be dismissed in its current form because "[t]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might not ever come to fruition." *Trafalgar*, 227 F.3d at 20–21. As discussed above in my good faith analysis, TTT has failed to sufficiently allege that either BCI or Papayanis made any false representations. Without alleging additional facts explaining why an RNP.5 aircraft is not considered to be "RNP1 capable," the statements that have already been alleged are either true, mere puffery, or at best, promissory in nature.[2] Accordingly, I dismiss TTT's negligent misrepresentation claim without prejudice.

## CONCLUSION

Counts I (breach of contract), V (tort), and IV (promissory estoppel) of the Complaint are dismissed with prejudice. Counts II (breach of implied covenant of good faith and fair dealing) and VI (negligent misrepresentation) are dismissed without prejudice.

ENTER:

James B. Zagel
United States District Judge

DATE: February 5, 2015

---

[2] It should be noted that this is not a case where Plaintiff is attempting to plead anything in the alternative.