| | | |
|---|---|---|
| THAI TOURS AND TRANS AIRWAYS COMPANY, LTD., | | |
| Plaintiff, | | |
| v. | | No. 13 C 8511 |
| | | Judge James B. Zagel |
| BCI AIRCRAFT LEASING, INC. and CRAIG PAPAYANIS, | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thai Tours and Trans Airways ("TTT") filed this action against Defendants

BCI Aircraft Leasing, Inc. ("BCI") and Craig Papayanis ("Papayanis"), alleging breach of good

faith and fair dealing (Count I), fraudulent misrepresentation (Count II), and negligent

misrepresentation (Count III). This matter is presently before the court on Defendants' motion

for summary judgment on all three of these claims. For the following reasons, I grant

Defendants' motion in part and deny it in part.

## BACKGROUND

BCI is a commercial aircraft leasing company that, among other things, leases older

Boeing 737-300s and 737-400s, known as "Classics," in emerging markets, such as Latin

America, Africa, and Asia. Craig Papayanis is the Managing Director and Chief Financial

Officer of BCI. TTT is a start-up airline in Thailand that planned on providing travel and

entertainment packages to various Asian locations, such as China, India, Hong Kong, and

Singapore. These plans never came to fruition.

A central component to this case is a metric for measuring plane navigation systems,

required navigation performance ("RNP"). A plane with an RNP of 1 (referred to as "RNP1") means that the plane is equipped with a navigation system that is capable of calculating its position to within a circle with a radius of 1 nautical mile. A plane with an RNP of .5 (or "RNP.5") means that the plane's navigation system can calculate its position to within a smaller circle, one with a radius of 0.5 nautical miles. This metric is important in the present case because, according to TTT, a plane's RNP is one factor that an airport can use to determine whether that plane can access the airport.

TTT and BCI began discussing an aircraft lease arrangement in April 2013. When TTT's CEO and President, Athit Apichari, reached out to BCI, he specifically requested aircrafts with RNP1 capability. Through a consultant who lived in Asia, BCI requested a meeting with Apichari to discuss BCI's aircrafts and to learn more about TTT. After BCI sent Apichari technical information about the plane, Apichari expressed skepticism regarding the RNP issues, stating in writing that "RNP 1 require[s] dual FMC and dual INU plus dual multimode receiver or GPS / GNSS receiver" and that the specifications lacked identification of that equipment."

Around this same time, TTT was also discussing a possible lease with another aircraft leasing company, AerSale Aviation Limited ("AerSale"). After AerSale offered to lease two aircraft for a monthly price of $40k each, TTT consulted with the Thai aviation authority about the AerSale aircraft, signed a letter of intent, and paid a security deposit. The AerSale planes were not RNP1 capable.

Various executives at TTT, including Apichari, traveled to Miami in May 2013 in order to discuss a possible BCI lease. During this May visit, Apichari and other TTT staff members did a walk-through of BCI's aircraft. Although these planes were not the exact ones that would later become the subject matter of the proposal letter, they were from the same fleet.

A few days after the Miami walk-through, BCI and TTT began negotiating a proposal letter for BCI's aircraft. Apichari noted that, among other things, he assumed that "the offered aircraft's delivery condition will be . . . RNP 1 capable." At the time, Papayanis and BCI claim to have believed that the aircraft would be RNP.5 capable. This belief was based on documents related to a previous BCI lease, specifically a one-page document that addressed the software capabilities of the planes. According to this document, the aircraft were equipped with computer software that was compatible with RNP1 capable systems. Defendants claim that they overlooked the fact that, without the necessary hardware – dual GPS systems – the planes did not actually have RNP1 or RNP.5 capability.

After these discussions, TTT canceled its letter of intent with AerSale and signed a seven-page agreement—a document that refers to itself as a "proposal letter," but is referred to by the parties as a letter of intent (the "LOI")—with BCI on June 22, 2013. The LOI summarizes the terms and conditions of the arrangement, namely that BCI would provide TTT with two freshly painted Boeing 737-300 aircrafts, identified by their serial numbers, for a monthly price of $50k per aircraft for 36 months. In addition to providing that each "aircraft shall be RNP1 capable," the LOI includes a choice of law provision that designates New York state law and requires TTT to pay a $150k security deposit for each aircraft, with $50k due upon execution of the LOI, $50k due upon execution of the "definitive lease agreement," and $50k due upon delivery of each aircraft. Both parties signed the LOI at the bottom of the last page where it said "please evidence your acceptance of the provisions of this Proposal Letter by signing it in the space provided below" and penned floating signatures on the bottom of the first six pages.

As required by the LOI, TTT gave BCI a $50k security deposit for each aircraft and two of TTT's aviation consultants traveled to Miami to inspect the aircraft. During this visit,

TTT inspected the outside of both aircrafts and the interior of one of the aircrafts. On July 9, 2013, TTT walked away from the transaction and requested the return of its security deposit. BCI paid it back immediately. One month later, on August 3, 2013, the LOI was amended to provide new delivery dates for the two aircrafts, September 15, 2013 and November 15, 2013.

BCI claims that it did not discover that the two planes lacked RNP1 capability until September 2013, and immediately informed TTT. On September 24, 2013, BCI provided TTT with a final draft of the lease that took out the condition that the aircraft would be RNP1 capable. When TTT objected that they had agreed to RNP1 capability, BCI said that it would cost TTT between $500-$850k to outfit each aircraft with RNP1 equipment. Consequently, TTT informed BCI that it was unwilling to accept anything other than the promised RNP1 capable aircrafts. In an email to outside legal counsel, however, Apichari said "we will leave the RNP 1 matter behind. I can accept the aircraft without it. I just want to use it to gain more concession from BCI. If they give, we move ahead. If they do not, we then ask for the deposit back."

Two weeks later, BCI informed TTT that it could not deliver RNP1 capable aircrafts or offer the concessions that TTT had requested. This brought an end to the parties' relationship, and BCI returned TTT's security deposit.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

**DISCUSSION**

**I.      Breach of Good Faith (Count I)**

As discussed in this Court's February 5, 2015 Memorandum Opinion and Order, the LOI is a preliminary agreement that is categorized as a Type II contract under New York law. In a Type II contract, "the parties express mutual commitment to contract on the agreed main terms, while recognizing the existence of open terms that require further negotiation." *See Teachers Ins. & Annuity Assoc. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) ("*Tribune*"). Furthermore, Type II contracts bind parties with a mutual commitment to negotiate the open issues in good faith. *Tribune*, 670 F. Supp. at 498.

The Second Circuit has explained the purpose of an agreement to negotiate in good faith as follows: "In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) ("*L–7 Designs I*"). A party "may abandon the transaction" as long as it has "made a good faith effort to close the deal" and has "not insisted on conditions that do not conform to the preliminary writing." *Id.* "In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated." *L–7 Designs, Inc. v. Old Navy, LLC*, 964 F.Supp.2d 299, 307 (S.D.N.Y. 2013) ("*L–7 Designs II*").

Good faith is admittedly difficult to describe, but *L-7 Designs II* draws several generalizations. *Id.* First, "good faith requires honesty in fact." *Id.* Second, "self-interest is not bad faith." *Id.* Third, "bad faith requires some 'deliberate misconduct'—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment." *Id.* at 307. Lastly, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).

Here, BCI's conduct—attempting to provide two planes that were not RNP1 capable even though the LOI clearly specified that the planes would have RNP1 capability—seems to fall squarely into one of the generalizations set forth in *L-7 Designs II*. Defendants argue that they made a good faith mistake regarding the RNP capability of the two planes by confusing their software capabilities with the planes' actual hardware. This argument, however, is questionable

because it overlooks the fact that BCI repeatedly affirmed their mistaken representation for four months without providing TTT with a copy of the one-page document that addressed the planes' software capabilities or explaining that their assertions were solely based on this document.

It is also unclear whether TTT's access to the plane—which was limited to an extremely short amount of time, ten minutes, and an incomplete set of documents —was sufficient to overcome BCI's misrepresentations. Whether BCI's mistake was made in good faith or bad faith, therefore, involves several genuine issues of material fact that can only be resolved by fact-finder. Accordingly, I am denying Defendants' motion for summary judgment on TTT's breach of good faith claim.

## II.        Fraudulent Misrepresentation (Count II)

Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance, also referred to as reasonable reliance, by the plaintiff, and (5) damages. *Loreley Fin. No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 13-1476-CV, 2015 WL 4492258, at *7 (2d Cir. July 24, 2015) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).

A fraud claim may not proceed past summary judgment unless an actionable misstatement can be attributed to the defendant. *King County, Wash. V. IKB Deutsche Industriebank* AG, 916 F.Supp.2d 442, 447 (S.D.N.Y. 2013). Although Papayanis has testified that he did not have any knowledge of his misstatements, a reasonable fact-finder could easily reach the opposite conclusion based upon his expertise –and the expertise of other top executives at BCI—as well as the small number of planes in BCI's control. Summary judgment is therefore inappropriate here because this determination can go either way, and will ultimately depend on

the credibility of the witnesses presented by both parties.

Defendants also argue that TTT cannot prove justifiable reliance, another required element of any fraud claim under New York law. *See Vasquez v. Soto*, 61 A.D.3d 968 (2nd Dept, 2009); *see also Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001); *Woori Bank v. RBS Securities, Inc.*, 910 F. Supp. 2d 697, 705 (S.D.N.Y. 2012). In determining whether reliance is reasonable, the Second Circuit has said: "we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234-35 (2d Cir. 2006) (internal citations omitted). "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Id.* "If the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Id.*

To support their argument, Defendants claim that the facts of this case are analogous to *Vasquez.* In *Vasquez*, a purchaser of real property claimed that the property's seller and sales agent made affirmative misrepresentations by representing that the subject property was a legal two-family dwelling when in reality, the certificate of occupancy for the property was for a one-family dwelling. *Vasquez*, 61 A.D.3d at 969. Prior to closing, the plaintiffs' attorney obtained a title search that revealed the actual certificate of occupancy for the property. *Id.* Although the plaintiffs' attorney somehow overlooked the discrepancy between the defendants' representations and the title search, the *Vasquez* court entered summary judgment in favor of the defendants, finding that the plaintiffs' claimed reliance on the defendants' misrepresentations

were not reasonable or justifiable. *Id.* The court reasoned that, while the plaintiffs' attorney did not notice the information regarding the certificate of occupancy, it was available to the plaintiffs. *Id.*

Unlike the plaintiffs in *Vasquez*, however, TTT never received an unambiguous document that refuted their misrepresentations. Defendants argue that TTT should have been able to discover their mistake when they conducted an independent investigation of the planes. As discussed above, however, it is unclear whether TTT's access to the plane—which was limited to an extremely short amount of time and an incomplete set of documents—was sufficient. A reasonable fact-finder could decide this issue either way. Because there are genuine issues of material fact, I am denying Defendants' motion for summary judgment on TTT's fraudulent misrepresentation claim.

### III.      Negligent Misrepresentation (Count III)

Under New York law, negligent representation requires that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

As discussed in this Court's February 5, 2015 Memorandum Opinion and Order, it was unclear from the complaint whether a special duty existed between BCI and TTT that could give rise to a negligent misrepresentation claim. Although I denied Defendants' motion to dismiss TTT's negligent misrepresentation claim during this early stage of litigation, I am now granting

9

summary judgment on TTT's negligent misrepresentation claim because it is clear that the parties lacked the special relationship, and therefore duty, required for a negligent misrepresentation claim under New York law.

While "[t]he existence and scope of a duty of care is a question of law" *Murphy v. La Framboise Grp., Ltd.*, 839 N.Y.S.2d 883, 885 (2007), both the Second Circuit and the New York Court of Appeals have stated that whether a special relationship exists between two parties is a question of fact to be governed by weighing three factors: (1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001); *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).

TTT attempted to overcome this deficiency in its pleading by emphasizing the extravagant promises that Defendants made about their knowledge of commercial aircrafts and their sway over aviation authorities in Southeast Asia. It is now clear, however, that the relationship between TTT and BCI was nothing more than an ordinary business relationship between sophisticated parties. Accordingly, I am granting Defendants' motion for summary judgment on Count III of the complaint and dismissing TTT's negligent misrepresentation claim.

**CONCLUSION**

I am granting Defendants' motion for summary judgment in part and denying it in part. Plaintiff's negligent misrepresentation claim is dismissed, but Plaintiff may proceed with its breach of good faith and fraudulent misrepresentation claims.

ENTER:

James B. Zagel
United States District Judge

DATE: August 18, 2015